COURT OF APPEALS
DECISION
DATED AND FILED

December 29, 2020

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

**This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.**

**A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.**

**Appeal No. 2020AP565**

**STATE OF WISCONSIN**

Cir. Ct. No. 2015CV832

**IN COURT OF APPEALS
DISTRICT III**

TOWN OF EASTON,

   PLAINTIFF-APPELLANT,

 V.

ANDREW L. OLSON AND PEGGY S. OLSON,

   DEFENDANTS-RESPONDENTS.

        APPEAL from a judgment of the circuit court for Marathon County: JILL N. FALSTAD, Judge. *Affirmed*.

        Before Stark, P.J., Hruz and Seidl, JJ.

        **Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

        ¶1        PER CURIAM.   The Town of Easton appeals a judgment dismissing its claims against Andrew and Peggy Olson.  The Town argues the circuit court

improperly granted the Olsons summary judgment on the Town's claim that the Olsons had violated the Town's zoning code. The Town also argues the court erred by dismissing its public nuisance claim against the Olsons following a bench trial. We reject the Town's arguments and affirm.

## BACKGROUND

¶2 The Olsons purchased the property at issue in this case ("the Property"), which is located in the Town on County Road N, in approximately 1993. Since the late 1990s, they have used the Property in connection with their towing business, Andy's Towing, LLC. The Olsons do not live on the Property.

¶3 Peggy Olson ordinarily works out of Andy's Towing's office in Schofield, Wisconsin. She receives calls to tow vehicles twenty-four hours a day, seven days a week, from both private individuals and law enforcement.

¶4 Vehicles towed by Andy's Towing may be transported to and temporarily stored at the Property for a variety of reasons. For instance, when law enforcement asks Andy's Towing to tow a vehicle, the vehicle owner may not be present to say where the vehicle should be taken. In other situations, the vehicle owner may ask to have the vehicle towed to a repair business with which Andy's Towing does not have a preexisting relationship, in which case Andy's Towing will not drop the vehicle off at that business outside of normal business hours. On other occasions, a vehicle may be towed to and temporarily stored at the Property while its owner decides where to take the vehicle for repairs. Towed vehicles are also temporarily stored at the Property while insurance companies make decisions about whether, and where, they should be repaired.

¶5 The Olsons do not operate a salvage yard and do not sell car parts from the vehicles they tow. They do not junk or wreck vehicles. They do not perform any repair work on the towed vehicles that are stored at the Property. The Olsons, as well as their nephew, keep some additional vehicles on the Property that are not involved with Andy's Towing. Repair work is sometimes performed on those additional vehicles at the Property.

¶6 Although the Olsons do not operate a salvage yard, they sell unclaimed vehicles to a salvage company after giving the appropriate notice to the vehicle owner and any lienholders. Selling to a salvage company allows a towing business to recover a portion of its towing bills for abandoned vehicles, which would otherwise go unpaid. After accumulating a certain number of unclaimed vehicles, the Olsons stage the vehicles near County Road N to be picked up by the salvage company. The staged vehicles are ordinarily picked up within one week, but they sometimes remain near the highway for longer periods. The Olsons have, at times, removed tires from the vehicles awaiting salvage at the salvage company's request. In addition, the hoods of those vehicles are sometimes left open while they await pickup.

¶7 Aside from the unclaimed vehicles that are staged for pickup by the salvage company, the other vehicles stored on the Property are kept behind a fence that runs parallel to County Road N, along the Property's south side. The fence was originally erected in about 2005. The fence subsequently sustained some wind damage, but the Olsons repaired it in about 2015.

¶8 In addition to the fence, sometime between 2000 and 2005, the Olsons constructed a dirt berm along the eastern side of the Property, which now has trees growing on it. Their intent in constructing the berm was to shield the vehicles stored

on the Property from public view. There is also a slight berm along the western side of the Property, as well as a line of mature trees. Thus, the public's only unobstructed view of the Property is from its north side.

¶9     To the north of the Property, there are seventy acres of cropland. The nearest neighbor to the west of the Property lives approximately one-quarter mile away. A vacant pasture lies to the east of the Property. There is cropland to the south of the Property, on the opposite side of County Road N. Vehicles traveling on County Road N are subject to a speed limit of fifty-five miles per hour.

¶10    The Town believes that the Property has the appearance of a "junkyard" and is an eyesore. Accordingly, in November 2015, the Town filed a complaint against the Olsons, alleging that their use of the Property violated the Town's zoning code and constituted a public nuisance. The Town later amended its complaint to allege a third cause of action, asserting the Olsons had violated WIS. STAT. § 175.25 (2017-18)[1] by storing junked vehicles and vehicle parts in the open without a permit. The Olsons then filed a counterclaim for a declaration of interest in real property under WIS. STAT. § 841.01, seeking to preserve their use of the Property.

¶11    The Town subsequently moved for partial summary judgment on its zoning and WIS. STAT. § 175.25 claims, and on the Olsons' counterclaim. On July 5, 2017, the circuit court issued a written decision granting the Town summary judgment on the Olsons' counterclaim, but denying the Town's motion as to its zoning and § 175.25 claims. As relevant to this appeal, with respect to the zoning claim, the court reasoned there was a dispute of fact as to whether the Property was

---

[1] All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

4

zoned A-2 Agricultural or C-1 Commercial. The court also observed that it was unclear whether the Olsons' use of the Property was permissible as a prior nonconforming use, given that the Town had not produced the version of the zoning code that was in effect when the Olsons purchased the Property.

¶12 The circuit court later granted the Town leave to file a second summary judgment motion after the Town located a copy of its 1975 zoning code. In its second summary judgment motion, the Town sought summary judgment on each of its three claims against the Olsons. As relevant to its zoning claim, the Town conceded that the Property is zoned C-1 Commercial. Nevertheless, it argued the Olsons' use of the Property was not permissible in the C-1 Commercial District. The Town also argued that there were no relevant differences between its 1975 and 1997 zoning codes, and the Olsons' use of the Property thus did not qualify as a prior nonconforming use. The Olsons, in turn, argued they used the Property as a parking lot, which was a permissible use in the C-1 Commercial District.

¶13 On October 9, 2018, the circuit court issued a written decision denying the Town's second summary judgment motion and instead granting summary judgment to the Olsons on the Town's zoning and WIS. STAT. § 175.25 claims.[2] With respect to the Town's zoning claim, the court agreed with the Town that the Olsons' use of the property was not a prior nonconforming use. The court concluded, however, that the undisputed facts established the Olsons used the Property as a parking lot, which was a permissible use in the C-1 Commercial District. The court therefore stated there was no "basis upon which the Town could prevail on its zoning claim."

---

[2] The Town does not raise any issue on appeal regarding the circuit court's dismissal of its WIS. STAT. § 175.25 claim, and we therefore do not address that claim further.

¶14      The circuit court subsequently held a bench trial on the only remaining claim—i.e., the Town's claim that the Olsons' use of the Property constituted a public nuisance.  Following the bench trial, in an oral ruling on February 5, 2020, the court concluded the Olsons' use of the Property "did not rise to the level of being so substantial or annoying that this Court can find it constituted a public nuisance." The court later entered a final judgment dismissing the Town's public nuisance claim, and the Town now appeals.

## DISCUSSION

### I.  The Town's zoning claim

¶15      On appeal, the Town first argues that the circuit court erred by dismissing its zoning claim on summary judgment.  We independently review a grant of summary judgment, using the same methodology as the circuit court. *Hardy v. Hoefferle*, 2007 WI App 264, ¶6, 306 Wis. 2d 513, 743 N.W.2d 843. Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." WIS. STAT. § 802.08(2).  Here, the Town argues the circuit court erred by determining, as a matter of law, that the Olsons' use of the Property did not violate the Town's zoning code.  The interpretation of a municipal ordinance presents a question of law that we review independently, using the same rules that we apply when interpreting statutes.  *Bruno v. Milwaukee Cnty.*, 2003 WI 28, ¶6, 260 Wis. 2d 633, 660 N.W.2d 656.

¶16      As relevant here, the Town's zoning code provides: "In any district no building or land shall be used and hereafter no building shall be erected[,] structurally altered or relocated except for one or more of the uses hereinafter stated

for that district." TOWN OF EASTON, WIS., ZONING CODE § 3.04(1) (1997) (hereinafter, "ZONING CODE"). Thus, no use of property is allowed in the Town unless it is expressly permitted by the zoning code. The Town correctly notes that a towing business is not one of the listed "permitted uses" for the C-1 Commercial District. *See* ZONING CODE § 14.02. The Town further observes that although the zoning code sets forth certain "exempted uses" that are permitted in any zoning district, a towing business is not one of those exempted uses. *See* ZONING CODE § 5.04. The Town therefore argues that based on the undisputed facts and the zoning code's unambiguous language, the circuit court erred by concluding the Olsons' use of the Property did not violate the zoning code.

¶17 The circuit court concluded, however, that the Olsons use the Property as a parking lot, which is a permitted use in the C-1 Commercial District. *See* ZONING CODE § 14.02(24). According to the parties and the circuit court, § 2.03 of the zoning code defines the term "parking lot" as "[a] lot where automobiles are parked or stored temporarily, but not including the wrecking of automobile[s] or other vehicles or storage for the purpose of repair or wrecking."[3] Applying this definition, the court concluded the Olsons use the Property as a parking lot because they store towed vehicles there "only temporarily, and they do not use the property as a final resting place for junked vehicles."

¶18 The Town argues the circuit court erred because the zoning code's definition of a "parking lot" specifically excludes "storage for the purpose of repair or wrecking." The Town asserts the undisputed facts show that the Olsons use the

---

[3] On appeal, neither the Olsons nor the Town cite any portion of the appellate record that contains a copy of § 2.03 of the zoning code. Instead, the Town cites its own summary judgment briefs, and the Olsons cite the circuit court's July 5, 2017 summary judgment decision. Nonetheless, because the parties agree that § 2.03 of the zoning code contains the definition of "parking lot" set forth above, we accept and apply that definition for purposes of this appeal.

7

Property to store cars for the purpose of repair or wrecking, and, as such, their use falls outside the zoning code's definition of a "parking lot." In response, the Olsons assert that their use of the Property falls within the definition of a "parking lot" because they do not conduct repair, wrecking, or salvage of vehicles *on the Property*. They contend the undisputed facts show that "[w]hen the decision [is] made to repair or wreck a vehicle, said vehicle [is] removed from the temporary storage on the property."

¶19    We conclude the zoning code's definition of a "parking lot" is ambiguous—that is, it is "capable of being understood by reasonably well-informed persons in two or more senses." *See* ***State ex rel. Kalal v. Circuit Court for Dane Cnty.***, 2004 WI 58, ¶47, 271 Wis. 2d 633, 681 N.W.2d 110. The definition clearly states that a parking lot is a lot where automobiles are parked or stored temporarily. However, the subsequent exclusionary phrase—"but not including the wrecking of automobile[s] or other vehicles or storage for the purpose of repair or wrecking"—is reasonably susceptible to two interpretations.

¶20    On one hand, the phrase in question could reasonably be interpreted to mean that a property where automobiles are parked or stored temporarily does not qualify as a parking lot if either of two activities occurs on the property: (1) the wrecking of automobiles or other vehicles; or (2) the storage of vehicles for the purpose of repair or wrecking, regardless of where that repair or wrecking ultimately takes place. Applying this interpretation, the Olsons' use of the Property would not qualify as a parking lot because it is undisputed that they temporarily store vehicles on the Property that are subsequently transported to other locations for repair or wrecking.

¶21    On the other hand, one could reasonably interpret the phrase in question to mean that a property where automobiles are parked or stored temporarily does not qualify as a parking lot if: (1) vehicles are wrecked on the property; or (2) vehicles are stored on the property for the purpose of subsequent wrecking or repair *on the property*.  Contextually, the fact that the definition of "parking lot" first excludes wrecking on the property suggests that its subsequent reference to "storage for the purpose of repair or wrecking" also refers to repair or wrecking performed on the property.  Applying this interpretation, the Olsons' use of the Property would qualify as a parking lot because they temporarily store vehicles on the Property, but they do not perform any wrecking on the Property, nor do they store vehicles for the purposes of repair or wrecking performed on the Property.

¶22    "Zoning ordinances are in derogation of the common law and, hence, are to be construed in favor of the free use of private property." *Cohen v. Dane Cnty. Bd. of Adjustment*, 74 Wis. 2d 87, 91, 246 N.W.2d 112 (1976).  "To operate in derogation of the common law, the provisions of a zoning ordinance must be clear and unambiguous." *Heef Realty & Invs., LLP v. City of Cedarburg Bd. of Appeals*, 2015 WI App 23, ¶7, 361 Wis. 2d 185, 861 N.W.2d 797.  We therefore "resolve[] all ambiguity in the meaning of zoning terms in favor of the free use of private property." *Cohen*, 74 Wis. 2d at 91.  Here, the zoning code's definition of a "parking lot" does not unambiguously exclude the Olsons' use of the Property.  Accordingly, construing the ordinance in favor of the free use of private property,

9

we conclude the Olsons' use of the Property qualifies as a "parking lot" and is therefore permissible in the C-1 Commercial District.[4]

¶23    The Town argues that when analyzing whether the Olsons' use of the Property qualifies as a "parking lot," we must consider the zoning code's statement of purpose regarding the C-1 Commercial District, which provides:

> PURPOSE:
>
> This district is designed to provide for a wide range of retail stores and personal service establishments which cater to frequently recurring needs.  The regulations are designed to promote stability of retain development [sic] by encouraging continuous retail frontage.

ZONING CODE § 14.01.  The Town asserts this statement of purpose shows that the Olsons do not use the Property as a parking lot because the Property does not "serv[e] a retail purpose identified in the C-1 Commercial District" and the vehicles stored on the Property "bear no relationship to customers visiting a retail store."

¶24    We are not persuaded.  Our case law permits us to consider an ordinance's statement of purpose.  See *Kalal*, 271 Wis. 2d 633, ¶¶48-49.  However, the zoning code's purpose statement for the C-1 Commercial District is of little aid here.  While the purpose statement references retail stores, it does not expressly bar uses that fall outside of that category.  Moreover, the zoning code expressly lists

---

[4] The Town cites *Town of Rhine v. Bizzell*, 2008 WI 76, ¶18, 311 Wis. 2d 1, 751 N.W.2d 780, for the proposition that a zoning code "is presumed valid and must be liberally construed in favor of the Town."  The Town's reliance on *Bizzell* is misplaced.  As this court has previously explained, "[t]he power to *enact* zoning ordinances is broadly construed in favor of the municipality."  *Heef Realty & Invs., LLP v. City of Cedarburg Bd. of Appeals*, 2015 WI App 23, ¶7, 361 Wis. 2d 185, 861 N.W.2d 797 (emphasis added).  "However, '[z]oning ordinances are in derogation of the common law and, hence, are to be construed in favor of the free use of private property.'"  *Id.* (quoting *Cohen v. Dane Cnty. Bd. of Adjustment*, 74 Wis. 2d 87, 91, 246 N.W.2d 112 (1976)).  Thus, when interpreting a zoning ordinance to determine whether it prohibits a specific use of property, we construe any ambiguity against the municipality and in favor of the free use of private property.  *See id.*

parking lots as a permitted use in the C-1 Commercial District.  *See* ZONING CODE § 14.02(24).  Nothing in the zoning code's definition of the term "parking lot" requires that a parking lot provide access to a retail business.  Under these circumstances, and given that we must construe zoning ordinances in favor of the free use of private property, we decline to read into the definition of "parking lot" a requirement that a property used as a parking lot serve a retail purpose.

¶25    The Town also argues that the Property cannot qualify as a parking lot because § 18 of the zoning code "creates parking lot specifications, such as the sizes of stalls required, the number of stalls required per type of business, and fencing requirements when a parking lot abuts a residential property."  The Town asserts the Olsons "did not present any record evidence showing that the Property complies with these requirements such that the circuit court could conclude that the Property is a 'parking lot.'"

¶26    We reject this argument for at least three reasons.  First, the Town does not cite any portion of the record containing § 18 of the zoning code.  We therefore have no way of knowing what requirements that section contains.  Second, neither the Town's original complaint nor its amended complaint alleged that the Olsons had violated the zoning code by failing to comply with any of the regulations for parking lots set forth in § 18.  Third, the Town does not explain why the Olsons' compliance or noncompliance with any regulations in § 18 is relevant to determining whether they use the Property as a parking lot in the first place.  It appears self-evident that a property could be used as a parking lot, based on the zoning code's definition of that term, but could nevertheless fail to comply with the specific requirements for parking lots allegedly set forth in § 18.

¶27     The Town next argues the circuit court "erroneously concluded that the Town does not have a zoning claim because the Olsons only store vehicles temporarily." The Town asserts there is "no temporal element applicable to the Olsons' use of the Property." The Olsons argue, however, that they use the Property as a parking lot. The zoning code's definition of a "parking lot" contains a temporal element, stating that a parking lot is "[a] lot where automobiles are parked or stored *temporarily*." (Emphasis added.) The court thus properly relied on the undisputed fact that the Olsons temporarily store towed vehicles on the Property.[5]

¶28     Finally, the Town emphasizes that, in addition to the towed vehicles, the Olsons keep some other vehicles on the Property, which the Olsons contend are legal collector vehicles. The Town asserts the Olsons "provided no proof" that those vehicles qualify as collector vehicles. The Town does not develop any argument, however, explaining why it matters, for purposes of the zoning code, whether the additional vehicles qualify as collector vehicles. The Town does not explain, for instance, why the presence of personally owned, noncollector vehicles on the Property would remove the Property from the zoning code's definition of a parking lot. We need not address undeveloped arguments. *See* ***State v. Pettit***, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992).

¶29     For all the foregoing reasons, we reject the Town's argument that the circuit court erred by dismissing its zoning claim on summary judgment.

---

[5] The Town also asserts the circuit court incorrectly stated in its decision that since January 1, 2006, vehicles have been stored at the Property "for periods ranging from one day to 80 days, with the vast majority lasting two weeks or less." The Town asserts the record instead shows that "32 to 123 towed vehicles were stored per year, with an average storage duration for each towed vehicle from 68 to 122 days." Be that as it may, the Town does not explain why the precise number of days that vehicles were stored at the Property is relevant to our analysis. The Town does not develop any argument that vehicles stored for 122 days or more are not stored "temporarily," for purposes of the zoning code.

Construing the zoning code in favor of the free use of private property, we conclude the undisputed facts establish that the Olsons use the Property as a parking lot, which is a permissible use in the C-1 Commercial District. The Olsons were therefore entitled to a judgment as a matter of law on the zoning claim.

## II. The Town's public nuisance claim

¶30    The Town also argues the circuit court erred by dismissing its public nuisance claim following the bench trial. Specifically, the Town argues the court applied an incorrect legal standard when assessing whether the Town had established that the Olsons' use of the Property constitutes a public nuisance. Whether the court applied the correct legal standard is a question of law that we review independently. *See* ***Republic Bank of Chi. v. Lichosyt***, 2007 WI App 150, ¶24, 303 Wis. 2d 474, 736 N.W.2d 153.

¶31    The Town and the Olsons agree that the applicable legal standard for a public nuisance claim is set forth in ***State v. Quality Egg Farm, Inc.***, 104 Wis. 2d 506, 311 N.W.2d 650 (1981). In that case, the State alleged that an egg farm constituted a public nuisance. ***Id.*** at 508-10. The circuit court found in favor of the State and granted injunctive relief. ***Id.*** at 511. The court of appeals reversed, concluding the evidence did not support a finding of public nuisance. ***Id.*** at 513. In so doing, we observed that Wisconsin's law on public nuisance differs from the majority rule. ***Id.*** at 514. We explained that under the majority rule, "for a public nuisance to exist there must be an injury to a number of persons and a public interest whereas under the Wisconsin law a public nuisance exists whenever you have an injury to a number of persons or a public interest." ***Id.*** (citation omitted). We further stated that "[i]n Wisconsin, when determining whether a nuisance is public or private, one looks to the number of persons injured and the degree to which they are

13

affected. One does not look to the nature of the interest concerned." *Id.* (citation omitted).

¶32 The Wisconsin Supreme Court subsequently reversed our decision in *Quality Egg*. *Id.* at 508. The supreme court agreed that our "distinction … between the majority rule and Wisconsin's rule as to public nuisance was correct." *Id.* at 514. However, the supreme court concluded we had, in fact, "applied … the majority rule and not the Wisconsin rule" when analyzing the case at bar. *Id.* Specifically, the supreme court concluded we had erred by focusing solely on the number of people affected by the egg farm. *Id.* at 514-15. The court explained:

> It is not only the number of people affected that determines whether the nuisance is public or private in Wisconsin, but also whether those persons constituted a local neighborhood or community or what the nature of the injury is as stated in *Costas v. Fond du Lac*, 24 Wis. 2d 409, 414, 129 N.W.2d 217 (1964): "The test is not the number of persons injured but the character of the injury and of the right impinged upon."

*Id.* at 515.

¶33 When later summarizing its holding in *Quality Egg*, the supreme court stated:

> The law in Wisconsin on public nuisance is not governed solely by the number of people affected. The number of people affected is only one of several criteria in Wisconsin's rule of public nuisance. Others referred to in this decision are the location of the operation or property; the degree or character of the injury inflicted or the right impinged upon; the reasonableness of the use of the property; the nature of the business maintained; the proximity of dwellings to the business; and the nature of the surrounding neighborhood or community. It is for the trier of fact to apply the evidence received to the criteria to be considered in determining whether a public nuisance is present. That evidence, depending on the circumstances of the case, may prove one

14

> or all of the criteria or a combination of the criteria, but with varying degrees of severity in each.

*Id.* at 520-21.

¶34    In its oral decision in this case, the circuit court properly applied the *Quality Egg* factors and determined, based on the evidence introduced at the bench trial, that the Town had failed to establish the existence of a public nuisance. First, in accordance with *Quality Egg*, the court addressed the number of people affected by the Olsons' use of the Property. *See id.* at 520. The court noted that while the Town presented witnesses who testified "that they found the condition of the property to be intolerable and substantially offensive," the evidence also showed that "none of the neighbors complained. In fact, one liked to see the big trucks roll in and felt safer." The court also observed that "[n]o neighbors or citizens actually filed any complaint with the town about the property." In addition, the court noted that "[e]ven the public driving by at 55 miles per hour would have a very brief and limited view of the property." On these facts, the court found that "not many people" were affected by the Property's condition.

¶35    The circuit court then addressed the location of the operation or property, the proximity of dwellings, and the nature of the surrounding neighborhood or community. *See id.* at 520-21. The court noted the Property was in "a more rural location, with few close neighbors, so this was not in a residential area or subdivision. This was not near a school or by children or by a medical facility or other public building like a library or swimming pool." The court further observed that there were "very few" dwellings near the Property, and it was instead "largely surrounded by farm fields." The court also found that the Property was largely shielded from view on its east and west sides by "berms or hills with trees

on them." Based on these facts, the court stated the Property's location did not "weigh in favor of the Court finding the property constitutes a public nuisance."

¶36 The circuit court next considered the nature of the Olsons' business and the reasonableness of their use of the Property. *See id.* at 520. The court stated that the nature of the business is "towing a wide range of vehicle types from one location, usually a crash site, to another location, eventually often a salvage yard," and that "[d]uring the interim period the vehicles must be parked or stored on the property." The court acknowledged that the vehicles "do not look attractive or new. They are all broken down in some way and/or damaged a little or severely." The court also acknowledged that "when broken and damaged vehicles are moved, some parts may rust or fall off. Some debris is scattered about." However, the court noted the Olsons had attempted to minimize public view of the vehicles by erecting a fence and piling dirt into berms.

¶37 The circuit court also recognized that the Olsons stage vehicles outside the fence, near County Road N, for pickup by the salvage company. The court acknowledged that those vehicles do "not look good because they are damaged and wrecked items." In referring to those vehicles as "wrecked," we understand the court meant that the vehicles had been in accidents, not that they underwent "wrecking" on the Property. While the court agreed with the Town that the Property would look better if the Olsons staged the vehicles behind the fence, it could not find that the Olsons' decision to stage the vehicles near the highway was unreasonable. The court explained:

> For organization reasons and clarity, identifying the vehicles to be towed by placement in this designated area made sense. They were all in one spot and near the entrance so they could be easily collected by the salvage company. They did not stay at this location for years, as shown by the storage

16

documents kept by the business and based on the testimony presented.

Based on the nature of the Olsons' business, the court found that their use of the Property was reasonable.

¶38 The circuit court next addressed the degree or character of the injury inflicted or the right impinged upon. *See Quality Egg*, 104 Wis. 2d at 520. The court noted the Town's witnesses had expressed concerns about antifreeze and oil leaking from damaged vehicles onto the Property. The court stated, however, that there was "no proof in this record of any leaking or actual contamination." Accordingly, the court stated it could not "find the public has been injured in this respect."

¶39 The circuit court then considered whether the Town had demonstrated sufficient injury by showing that the Property was "an eyesore"—that is, that it "at times … had the appearance of a junkyard." The court acknowledged that the Property "did not always look perfect" and that, at times, "the fences did need repairs and a significant number of damaged vehicles were readily visible to the public." The court also noted, however, that there were times when "the fences looked good, the vehicles [were] largely hidden by fences and trees, and the property looked more well kept." The court then concluded:

> [W]hen the Court looks at the totality of the factors just addressed, the Court cannot find the condition of the property constituted a public nuisance. The Town did not prove that there were odors, contamination, health, or safety concerns, traffic problems, vibrations, loud sounds, or bright lights associated with this business at all. Though the property did look messy at times, it did not rise to the level of being so substantial or annoying that this Court can find it constituted a public nuisance.

¶40      The circuit court's detailed oral ruling shows that it applied the proper legal standard by discussing each of the factors set forth in *Quality Egg*.  The Town nevertheless argues the court erred because, although it purported to apply *Quality Egg*'s "Wisconsin rule," it actually applied the "majority rule" from other jurisdictions.  Specifically, the Town asserts that the Wisconsin rule "requires either (1) an injury to a number of persons or (2) a public interest," whereas the majority rule "requires both (1) an injury to a number of persons and (2) a public interest to prove a public nuisance."  The Town contends that, in this case, the court dismissed its nuisance claim based solely on the Town's failure to prove injury to a number of persons, even though the Town should have been permitted to instead prove injury to a public interest.

¶41      The Town's argument in this regard misses the mark.  The circuit court did not dismiss the Town's public nuisance claim based solely on a conclusion that the Town had not shown injury to a number of persons.  Instead, the court applied the evidence to each of the *Quality Egg* factors and, after weighing those factors, determined the Town had failed to prove that the Olsons' use of the Property constituted a public nuisance.  As the court noted in its oral ruling, both parties agreed at trial that the court should apply the *Quality Egg* factors to determine whether the Town had proved its nuisance claim.  The court did so, and, as such, it applied the correct legal standard.

¶42      In arguing to the contrary, the Town essentially contends that the circuit court gave too much weight to the number of people affected by the Olsons' use of the Property.  *Quality Egg* makes it clear, however, that a court may consider that factor in its public nuisance analysis.  *Quality Egg*, 104 Wis. 2d at 520.  *Quality Egg* also expressly states that "[i]t is for the trier of fact to apply the evidence received to the criteria to be considered in determining whether a public

18

nuisance is present." *Id.* at 521. That is precisely what the court did here. It applied the evidence to each of the *Quality Egg* factors, weighed those factors, and determined the Town had failed to establish the existence of a public nuisance. The court's decision therefore comported with the legal standard set forth in *Quality Egg*.

¶43 The Town also stresses that, in Wisconsin, appearance alone may create a nuisance. *See Apple Hill Farms Dev., LLP v. Price*, 2012 WI App 69, ¶14, 342 Wis. 2d 162, 816 N.W.2d 914. The Town thus appears to contend that because its witnesses testified the property had the appearance of a junkyard and was an eyesore, the circuit court was required to find that the Town had established a public nuisance.

¶44 As the fact finder, however, the circuit court was the sole arbiter of the weight to be given to the witnesses' testimony. *See State v. Peppertree Resort Villas, Inc.*, 2002 WI App 207, ¶19, 257 Wis. 2d 421, 651 N.W.2d 345. While the court acknowledged the Town's witnesses' testimony regarding the Property's appearance, it clearly gave more weight to the fact that neighboring property owners had never complained about the Olsons' use of the Property, and the fact that the Town had never received any formal complaints about the Property's appearance. The court also noted that while the Property "did not always look perfect," at times the Property "looked more well kept." It is clear the court concluded, based on the evidence presented at trial, that even if the Property's appearance was sometimes less than perfect, its appearance alone was not egregious enough to rise to the level of being a public nuisance.

¶45 We therefore reject the Town's argument that the circuit court applied an incorrect legal standard when assessing the Town's public nuisance claim. The

court properly considered the factors set forth in ***Quality Egg***, and the Town does not develop any argument that the court's findings regarding those factors were clearly erroneous. *See* WIS. STAT. § 805.17(2). As such, we affirm the court's determination that the Town failed to prove its public nuisance claim.

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.